IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FOR3D,

    Plaintiff,

    v

MICHAEL STARKS et al,

    Defendants.
_____/

AND RELATED COUNTERCLAIM
_____/

No  C-02-3564 VRW

FINDINGS OF FACT
CONCLUSIONS OF LAW

        Plaintiff For3D ("For3D") brought this action against defendant TDV Technologies, Corp ("TDVT") to clarify ownership of United States Patent No 6,108,005 ("the '005 patent").  TDVT contends that For3D lost title to the '005 patent on December 26, 2001, because For3D violated a term in its shareholder agreement that required it to secure adequate funding by that date.  Doc #85.  For3D counters that it secured adequate funding on time, TDVT lacks standing and TDVT is estopped from arguing that the shareholder

agreement lapsed. Doc #86. The parties have agreed that this case will be tried on the papers submitted. Doc #81. The court now makes its findings of fact and conclusions of law:

# I   FINDINGS OF FACT

1   Plaintiff For3d is a California corporation involved in 3D technology.

2   Defendant and counter-claimant TDVT is a Delaware corporation also involved in 3D technology. TDVT changed its name to X3D Technologies and now operates as Opticality Corporation.

3   Defendant and counter-claimant Armand Rousso ("Rousso") founded TDVT and operated it during the relevant period in this action.

4   Defendant Michael Starks ("Starks") and counter-defendant Alan Shulman ("Shulman") co-invented the '005 patent, which pertains to a method for producing a synthesized stereoscopic image.

5   Between about 1991 and 1997, Starks and Shulman conceived and developed the intellectual property that would later be captured by the '005 patent (the "pre-patent IP"). Tucker Decl (Doc #69-2), Ex F at 2:14-17.

6   On September 29, 1995, the pre-patent IP became an asset of Stereo Corporation, a Nevada corporation owned by Starks and Winston Schwyhart ("Schwyhart"). Id; Schwyhart Decl (Doc #67-4), Ex D.

7   On November 10, 1995, Stereo Corporation transferred the pre-patent IP to Space Corporation ("SpaceCorp"), a British Anguillan corporation that Starks and Schwyhart had registered

8   Schwyhart owned a 28.2 percent interest in SpaceCorp, and Starks owned the remaining 71.8 percent. Schwyhart had received this interest in exchange for a $50,000 investment in 3DTV and Stereo Corporation, companies that were owned by Starks and Schwyhart. Id at ¶ 2; id, Ex D at ¶ 2.

9   Starks and Shulman filed for the '005 patent on August 4, 1997, and it was issued on August 22, 2000. Tucker Decl, Ex D.

10  On June 26, 2001, Starks, Shulman, and two other entrepreneurs -- Rolf-Dieter Naske ("Naske") and Joshua Wattles ("Wattles") -- entered into a shareholder agreement forming For3D. Although all four individuals were shareholders of For3D, only Shulman and Naske were co-chairmen and members of the board of directors. Shareholder Agreement (Doc #67-3, Ex A) at ¶¶ 1, 2.

11  The shareholder agreement specifies that both Starks and Shulman contributed whatever interest they had in the '005 patent to For3D. Id at ¶¶ 4, 5. The agreement also states that "Schweihardt [sic] authorizes and joins in Space Corp's conveyance." Id at ¶ 5.

12  Paragraph 14 of the shareholder agreement specifies that if For3D did not secure adequate funding by December 26, 2001, all assets contributed to For3D, including the '005 patent, would be returned to their contributors, and For3D would be wound up and dissolved. Id at ¶ 14.

//
//

3

| | | |
|---|---|---|
| | 13 | The term "adequate funding" in paragraph 14 of the shareholder agreement was understood as the amount of funding sufficient to keep For3D in business for an additional year.  Second Shulman Decl (Doc #71-4) at ¶ 6. |
| | 14 | The shareholder agreement specifies that it "shall be governed by and construed in accordance with the laws of the State of California."  Shareholder Agreement at ¶ 20. |
| | 15 | The shareholder agreement also includes an arbitration clause, which provides that all disputes regarding the shareholder agreement would be submitted to arbitration through the American Arbitration Association in Alameda County, California.  Shareholder Agreement at ¶ 21. |
| | 16 | On July 15, 2001, Schwyhart agreed to the assignment of the '005 patent from SpaceCorp to For3D.  Schwyhart Decl, Ex B. |
| | 17 | On September 10, 2001, Starks and SpaceCorp assigned the '005 patent to For3D.  First Shulman Decl (Doc #67-3), Ex B.  The assignment was in consideration of For3D's assuming debts owed by Starks and shares being issued to Starks.  Id, Ex B; Shareholder Agreement at ¶¶ 1, 8. |
| | 18 | AMD Corporation provided $10,000 worth of free computers to For3D.  Second Shulman Decl at ¶ 8(n); id, Ex J. |
| | 19 | Between February and November 2001, Naske raised approximately $50,000 for For3D from Axel Kloss.  Id at ¶ 8(i). |
| | 20 | In February 2001, Remington Partners agreed to and later did loan $100,000 to For3D.  Id at ¶ 8(a); id, Ex B. |
| | 21 | Between June 26, 2001 and December 26, 2001, Production City, a sole proprietorship owned by Shulman, paid approximately $70,000 for space, utilities and services consumed by For3D. |

|   |   |
|---|---|
|    | For3D and Production City occupied the same location. Id at ¶ 8(d); id, Ex E. |
| 22 | In July 2001, Remington Partners loaned For3D another $10,000. Id at ¶ 8(b). |
| 23 | Also in July 2001, Fritz Bathelt loaned $26,000 to For3D. Id at ¶ 8(e); id, Ex F at 79:14-25. |
| 24 | Between July 1, 2001, and December 26, 2001, For 3D received approximately $3,000 worth of free equipment from Viewsonics Corporation and $11,000 worth of free software from Adobe Corporation. Id at ¶¶ 8(l), 8(m); id, Ex J. |
| 25 | Also between July 1, 2001, and December 26, 2001, Beth Hatch loaned For3D $11,000 and Roy Schwartz loaned For3D $10,000. Id at ¶¶ 8(h), 8(k); id, Ex G at 82:7-21; id, Ex I at 81:15-25. |
| 26 | In September 2001, For3D sold a For3D system for approximately $10,000. Id at ¶ 8(o). |
| 27 | Also in September 2001, Christie Digital Systems Canada, Inc ("Christie Digital") and For3D entered a Memorandum of Understanding that contemplated future business between the companies potentially worth millions of dollars to For3D. Id at ¶ 8(g); id, Ex D2. |
| 28 | Between about September and November 2001, For3D received a purchase order of $50,000 (initially $37,500) from Christie Digital. Id at ¶ 8(c); id, Ex D1. |
| 29 | On October 31, 2001, Shulman wrote in an email to Naske that Shulman was "putting together some paper to either/or extend the shareholder's [sic] agreement * * *." Naske Decl (Doc #84), Ex C. |

30   In November 2001, NASA committed to purchasing approximately $30,000 worth of products from For3D. The sale went through in July 2002. Second Shulman Decl at ¶ 8(f).

31   On November 11, 2001, Shulman wrote in an email to Naske that Shulman "shall have Mr [Robert] Henn draw up an extension on the shareholder's [sic] agreement * * *." Naske Decl, Ex D.

32   In December 2001, Invest Tec Corporation committed to investing $200,000 in For3D. The investment occurred in February 2002. Second Shulman Decl at ¶ 8(j); id, Ex H.

33   On December 1, 2001, For3D's bank account was overdrawn by $1,700. Naske Decl, Ex B. For3D also had $850,343 in short-term liabilities and only $13,300 in total assets. Id. For3D owned $15,000 in equipment. Id.

34   On December 7, 2001, Naske and TDVT formed an agreement under which Naske would work with TDVT and sell a patent to TDVT if the For3D shareholder agreement expired on December 26, 2001. Naske had previously contributed that patent to For3D when the company had been formed. Id, Ex H.

35   On December 11, 2001, Stuart Keirle ("Keirle"), who was For3D's Chief Financial Officer, wrote in an email to Naske:

> As you know the existing agreement technically expires on December 26th. Please see Section 14 Return of Agreement. This needs to be extended by at least 60 days by a separate agreement signed by all shareholders. I hope you agree. If not then this will create a major problem. As it is we are unlikely to obtain any funding without all the shareholders contributing their agreed assets.

Id, Ex E.

36   On December 25, 2001, Shulman wrote in an email to Starks: "Rolf [Naske] is dancing a little on extending the

6

|   |   |
|---|---|
|   | shareholder's [sic] agreement that is over today * * * but sending me an email that states you agree to extending the For3D's shareholder's [sic] agreement for another 6 months would be one less concern." First Shulman Decl, Ex D (omission in original). |
| 37 | On December 26, 2001, Starks wrote in response to Shulman's December 25, 2001, email: "yes I agree to extend the agreement." Id. |
| 38 | For3D did not reassign the '005 patent to Starks and SpaceCorp on December 26, 2001, or subsequent to that date. |
| 39 | On December 31, 2001, For3D's bank account was overdrawn by $1,221.39. Naske Decl, Ex B. |
| 40 | On January 21, 2002, Naske wrote in an email to Shulman: |

> But I want to make some things clear and don't want to have a lot of confusion later on.
>
> Currently, I'm negotiating with Fred [Hammett at TDVT] the new conditions of our shareholders agreement.
>
> But for the sake of good order, since Dec 26th 2001 I have the right to request my patent and other contributions back. I've espressed [sic] that request a number of times during our phone calls in November and December and I do it herewith again.
>
> I'm aware that the full execution of giving the contributions back depends on the loan agreement between you and me and between Remington Partners and FOR3D. We have to find a solution there as soon as possible.
>
> I have outlined my ideas for a new partnership in mails to Fred dated Dec 28th 2001, Jan 2nd 2002 and Jan 7th 2002! You have been on the CC list. So, you know that I assume my patent is not owned by FOR3D anymore.
>
> Yes, I want to have a partnership with you and Michael, definitely.

Id, Ex F.

41  On January 21, 2002, Starks emailed various people at Christie Digital regarding For3D's products. In the email, Starks referred to For3D as "[o]ne of [his] companies" and called Shulman his business partner. Starks signed the email as president of 3DTV Corp. First Shulman Decl, Ex C.

42  On January 22, 2002, Starks emailed Bill Speer, the director of quality assurance at Christie Digital, regarding Speer's concerns over the quality of For3D's products. Id.

43  On February 5, 2002, Starks responded to an email from Gary Greenberg, after Greenberg expressed interest in Starks's website. Starks promoted For3D's products and referred to John Urbanic of Neotek and Shulman as his colleagues. Id.

44  On February 6, 2002, Starks emailed Shulman with draft of an email to be sent to Naske. The draft email was intended to convince Naske not to leave For3D. Starks represented the legal difficulties Naske would face in leaving For3D, and also noted that "[t]he fact that the [For3D shareholder agreement] expires really does not free any of us from all responsibility." Id.

45  In February 2002, For3D negotiated with TDVT over licenses for certain technologies covered by the '005 patent.

46  On February 20, 2002, Shulman sent an email to Rousso referring to an earlier meeting between the two and proposing terms for TDVT licensing the '005 patent. Tucker Decl, Ex S.

47  On February 21, 2002, Shulman emailed Naske that "For3D recognizes that you have withdrawn your patent application from For3D's assets through your requests, emails and actions. It is further understood that you have relinquished all

|   |    |   |
|---|---|---|
| 1 |  | ownership, control, interest, stock and office in For3D." |
| 2 |  | Naske Decl, Ex G. |
| 3 | 48 | In late February or early March, a dispute arose between Starks and Shulman over the ownership of the '005 patent. |
| 5 | 49 | On March 5, 2002, Keirle gave Starks a $20,000 check (paid to the order of 3DTV Corp) for his continued involvement with For3D.  First Shulman Decl at ¶ 9; id, Ex E; Keirle Decl (Doc #83). |
| 9 | 50 | On March 9, 2002, Starks sent an email to Shulman and others: |

> This is another desperate attempt by Alan [Shulman] to insist that the For3D agt which expired [i]n Jan or Feb is still valid, even though all the 5 signatories but him now refuse to extend it.  I gave tentative approval provided all the others agreed to extend it and Dr. [N]aske refused.  Obviously an agreement that requires 5 signatures and does not get them cannot be valid.

Tucker Decl, Ex P.

51  On March 10, 2002, Shulman responded to Starks's March 9, 2002, email: "Lets let the lawyers sort this out what is correct.  This is very stupid on both our parts.  There is substantial money on the table."  Id.

52  On March 11, 2002, Shulman sent an email to Rousso and Starks:

> I just want to let you know that patent is owned by For3D, a California Corporation and not by Michael Starks or Space Corporation.  Michael does not have authority to act for For3D on his own.  Any action by For3D Corporation which owns the patent requires my written authorization as the Corporation's officer.

Id, Ex T.

53  On March 11, 2002 and in response to Shulman's email, Starks wrote that "[t]he grant to represent the patent to For3D Corp expired earlier this year."  Starks also asserted that he

9

owned SpaceCorp and that SpaceCorp owned the '005 patent. Id.

54  Neither Starks nor Shulman attempted to arbitrate ownership of the '005 patent under the arbitration clause of the shareholder agreement.

55  On March 15, 2002, Starks sent an email to Shulman:

> The For3D shareholders agreement expired in Jan 14th unless adequate funding was received. Adequate funding as defined by the business plan was for about $5 million and Techinvest gave you 225,000 at the end of Feb. You accepted the money knowing that you no longer had rights to the technology and thus put yourself and perhaps everyone associated with you in an untenable position. You appear to have misappropriated funds to pay Production City bills and personal expenses for yourself and your friends. You abused your position as acting head of For3D.
>
> I again ask that you cease representing that you/For3D has rights to our [United States] patent which is owned by SpaceCorp exclusively. Please return all copies to me and erase all copies from your computers. I also ask that you return all equipment belonging to 3DTV Corp.

Id, Ex Q.

56  Rousso and Starks met on a few occasions sometime after December 26, 2001, to discuss TDVT's purchase of the '005 patent. Rousso gave Starks $10,000 as a consulting fee at one of their meetings. Brubaker Decl (Doc #67-2) at ¶ 6; id, Ex D.

57  On April 16, 2002, Starks sent a letter to For3D:

> Notice of withdrawal of property and demand to wind up and dissolve For3D Corporation
>
> Under the terms of the For3D Shareholder's [sic] Agreement of June 26, 2001, if the company failed to received [sic] adequate funding in 6 months it was required to return the contributions of the shareholders and to wind up and dissolve.
>
> I have notified the company's sole acting officer, Alan Shulman in person, by email and by telephone on numerous occasions that the property contributed by

10

> myself and/or Space Corporation is no longer owned by For3D Corporation.
>
> It appears that our US Patent # 6108005 was unlawfully reassigned to For3D Corp and that is [sic] has not been returned to Space Corporation. We demand that you immediately return our patent by changing the assignment.
>
> We also demand that you wind up and dissolve For3D Corporation. Both of these actions should have commenced Dec 26th, 2001.
>
> This letter again formally withdraws Space Corporations [sic] US patent # 6108005 and the spacespex patent application from For3D Corporation of California in accordance with the terms of the shareholders [sic] agreement Dated June 26, 2001.

First Shulman Decl, Ex F.

58  On May 4, 2002, SpaceCorp (through Starks as authorized officer and representative) assigned the '005 patent to TDVT. Brubaker Decl, Ex A.

59  As consideration for SpaceCorp assigning the '005 patent to TDVT, TDVT agreed to pay $75,000 directly to Remington Partners, $175,000 to SpaceCorp and 400,000 shares of TDVT stock to SpaceCorp. Id, Exs B and C.

60  Starks did not receive Schwyhart's approval before assigning the '005 patent to TDVT. Schwyhart Decl at ¶ 10.

61  For3D alleges that Starks's assignment to TDVT was invalid and "in derogation of the rights of both co-inventor [Shulman] and Plaintiff For3D in the PATENT." Compl (Doc #1, Ex C) at ¶ 9.

62  In June 2002, For3D filed a complaint in the Marin County superior court and alleged, among other things, causes of action for slander of title, intentional interference with prospective business advantage, conspiracy to convert, unfair business practices in violation of Cal Bus & Prof Code ¶ 17200

|   |   |   |
|---|---|---|
| 1 |    | et seq and declaratory relief regarding patent ownership. |
| 2 |    | Compl. |
| 3 | 63 | On July 25, 2002, the case was removed to this court.  Not of |
| 4 |    | Rem (Doc #1). |
| 5 | 64 | On August 14, 2002, TDVT and Rousso answered the complaint and |
| 6 |    | filed counterclaims for declaratory relief regarding patent |
| 7 |    | ownership, for patent infringement under 35 USC § 271 and for |
| 8 |    | unfair competition.  Doc #7-1. |
| 9 | 65 | On December 18, 2002, Schwyhart wrote in an email to Starks: |
| 10 |    | "Where are you?  Hope all is well with you.  What has happened |
| 11 |    | since Spacecorp morphed into FOR3D?  Are we making money yet?" |
| 12 |    | Schwyhart Decl, Ex C. |
| 13 | 66 | On December 31, 2002, Starks wrote in reply to Schwyhart's |
| 14 |    | December 18, 2002, email that "lots happening but not with |
| 15 |    | For3D as the agreement expired and also Shulman turned out to |
| 16 |    | be a Lipton clone and had to part company."  Id.  Starks also |
| 17 |    | stated that he had moved to China.  Id. |
| 18 | 67 | On January 13, 2003, Schwyhart sent a letter to Shulman asking |
| 19 |    | about the patent and clarifying Schwyhart's interest in it. |
| 20 |    | Id, Ex D. |
| 21 | 68 | On June 20, 2005, the parties requested that the court |
| 22 |    | determine ownership of the '005 patent on the papers |
| 23 |    | submitted.  Doc #81.  The court granted the request the same |
| 24 |    | day.  Doc #82. |
| 25 | 69 | To the extent that any of these findings of fact should more |
| 26 |    | properly be characterized as conclusions of law, they shall be |
| 27 |    | deemed as such. |
| 28 | // | |

*United States District Court — For the Northern District of California*

**12**

**II   CONCLUSIONS OF LAW**

1   "A patent has the 'attributes of personal property.' Therefore, its ownership may be transferred by an assignment. An assignee may freely transfer his or her acquired rights." <u>SuperBrace, Inc v Tidwell</u>, 124 Cal App 4th 388, 393 (Cal Ct App 2004) (quoting 35 USC § 261).

2   None of the parties contest the patent assignment from Starks and SpaceCorp to For3D on September 10, 2001. Hence, the court concludes that this initial patent assignment was valid.

3   Whether patent ownership reverted back to SpaceCorp on December 26, 2001, depends on whether the shareholder agreement lapsed, which in turn depends on how the court interprets the term "adequate funding" in paragraph 14 of the shareholder agreement.

4   For3D appears on the wrong track to argue that TDVT lacks standing to assert that the shareholder agreement lapsed because the issue of contractual standing is irrelevant here. TDVT is not trying to enforce the shareholder agreement. Instead, TDVT looks to the shareholder agreement only to show that its predecessor-in-interest -- SpaceCorp -- properly obtained title to the patent. In other words, TDVT relies on the shareholder agreement simply to establish one link in its chain of title. And because TDVT's asserted patent rights directly depend on how the court interprets the shareholder agreement, For3D cannot prevent TDVT from arguing that the contract lapsed.

5   For3D is also incorrect in arguing that TDVT is estopped from challenging the shareholder agreement. For3D contends that if

13

it did not secure adequate funding, it was only because TDVT and Naske interfered in late 2001 with a major contract that For3D was negotiating with Digital Christie.  This contention might support a business tort claim, a claim for breach of the shareholder agreement or a breach of fiduciary duty claim or even an equitable defense against TDVT in an infringement action.  But this contention is not germane to SpaceCorp's right to reversion of the '005 patent.

6   To determine the meaning of "adequate funding," the court applies California law, as specified under paragraph 20 of the shareholder agreement.  This provision accords with the general principle that "[s]tate law governs contractual obligations and transfers of property rights, including those relating to patents."  <u>Regents Of University Of New Mexico v Knight</u>, 321 F.3d 1111, 1118 (Fed Cir 2003), cert denied, 540 US 820 (2003).

7   "In interpreting a contract, the objective intent, as evidenced by the words of the contract, is controlling."  <u>Lloyds Underwriters v Craig & Rush, Inc</u>, 26 Cal App 4th 1194, 1197 (Cal Ct App 1994).  And the court determines "the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made."  Id at 1197-98.

8   The court also may construe a contract by looking at the parties' actions subsequent to executing the contract but before a controversy arose.  <u>Spott Elec Co v Industrial Indemnity Co</u>, 30 Cal App 3d 797, 808 (Cal Ct App 1973).

//

9   The evidence conclusively shows that For3D did not have adequate funding as of December 26, 2001.  For3D's financial statements indicate that the company had over $850,000 in short-term liabilities on December 1, 2001, and it was overdrawn on its bank account both at the beginning and the end of the month.

10  Additionally, communications between Shulman, Starks, Naske and Keirle in late 2001 and early 2002 indicate that they knew For3D was in financial trouble and that an extension would be necessary to prevent the shareholder agreement from expiring on December 26, 2001.

11  The shareholder agreement was never extended.

12  Because For3d did not have adequate funding on December 26, 2001, For3D was obligated to assign the '005 patent to SpaceCorp.  Hence, the court concludes that ownership of the '005 patent reverted back to SpaceCorp on December 26, 2001.

13  To determine whether SpaceCorp's subsequent assignment of the '005 patent to TDVT was valid, the court examines whether the transfer violated British Anguillan law.

14  Section 125 of the Anguilla Companies Act (Doc #71-6), entitled "Shareholder approval of extraordinary transactions," states:

> (1) A sale, lease or exchange of all, or substantially all, the property of a company other than in the ordinary course of business of the company requires the approval of the shareholders in accordance with this section.
> (2) A notice complying with section 110 of a meeting of shareholders shall be sent in accordance with that section to each shareholder and shall--
> (a) include or be accompanied by a copy or summary of the agreement of sale, lease or exchange; and
> (b) state that a dissenting shareholder is entitled

15

> to be paid fair value of his shares;
> but failure to make the statement referred to in
> paragraph (b) does not invalidate a sale, lease or
> exchange referred to in subsection (1).
> (3) At the meeting referred to in subsection (2),
> the shareholders may authorise the sale, lease or
> exchange of the property, and may fix, or authorise
> the directors to fix, any of the terms and
> conditions of the sale, lease or exchange.
> (4) Each share of the company carries the right to
> vote in respect of a sale, lease or exchange
> referred to in subsection (1), whether or not it
> otherwise carries the right to vote.
> (5) The shareholders of a class or series of shares
> of the company are entitled to vote separately as a
> class or series in respect of a sale, lease or
> exchange in a manner different from the shares of
> another class or series.
> (6) A sale, lease or exchange referred to in
> subsection (1) is adopted when the shareholders of
> each class or series of shares who are entitled to
> vote on it have, by special resolution, approved of
> the sale, lease or exchange.
> (7) The directors of the company, if authorised by
> the shareholders approving a proposed sale, lease or
> exchange, may, subject to the rights of third
> parties, abandon the sale, lease or exchange without
> any further approval of the shareholders.
> (8) A company the contravenes subsection (2) commits
> an offence.

15   SpaceCorp's assignment of the '005 patent to TDVT may have violated Anguilla Companies Act § 125(2), but this does not invalidate the assignment to For3D: even if Starks had complied with the statute and Schwyhart had opposed the assignment, the majority of SpaceCorp's shareholders would have approved the assignment. Although Schwyhart might be entitled to fair value for his shares, this does not affect whether the transfer to TDVT was valid.

16   To the extent that any of the foregoing conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

//

16

Based on these findings and conclusions, the court concludes that the shareholder agreement lapsed on December 26, 2001, and ownership of the '005 patent reverted back to SpaceCorp. Additionally, SpaceCorp's subsequent assignment of patent ownership to TDVT was valid. Accordingly, TDVT is the rightful owner of the '005 patent.

These findings of fact and conclusions of law appear to resolve all remaining issues in this case. Accordingly, the parties are directed to provide the court with an appropriate form of judgment by November 30, 2005. If any other issues remain, the parties should contact the courtroom deputy, Cora Delfin, at 415-522-2039, to schedule a joint case management conference. In any event, the clerk is directed to terminate all pending summary judgment motions.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge